UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL LEASED HOUSING ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT*, et al.*, <br><br> Defendants. | Civil Action No. 03-1509 (CKK) |

**MEMORANDUM OPINION**
(January 16, 2007)

In this case, Plaintiffs challenge the Department of Housing and Urban

Development's implementation of an appropriations act applying a new funding structure

to the Section 8 low-income housing program as violating the Administrative Procedure

Act (APA) and the Due Process and Takings Clauses of the Fifth Amendment.  Presently

before the Court are [36] Plaintiffs' Motion for Summary Judgment and [37] Defendants'

Motion for Summary Judgment.  After reviewing the Parties' motions and related filings,

the operative complaint, the relevant statutes and case law, and the entire record herein,

the Court shall 1) grant Defendants' Motion and deny Plaintiffs' Motion with respect to

Plaintiffs' Takings and Due Process claims, accordingly dismissing said claims; 2) grant

Plaintiffs' Motion and Deny Defendants' Motion with respect to Plaintiffs' APA claim;

and 3) issue a remand to HUD to implement the Act at issue in a manner that comports

with the APA as set forth in the instant Opinion.

## I:  BACKGROUND

*A.      Public Housing Authorities and Section 8[1]*

The Section 8 Program, authorized by Congress in 1974, provides rental subsidies to eligible individuals and families.  *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12, 113 S. Ct. 1898, 1900, 123 L. Ed. 2d 572 (1993).  Recipients live in a variety of facilities, including new construction, rehabilitated properties, properties with mortgages secured by the federal government, and privately owned rental properties.  HUD, *Section 8 Program Background Information*, *at* http://www.hud.gov/ offices/hsg/mfh/rfp/s8bkinfo.cfm (content updated Mar. 18, 1999) ("Section 8 Background").  Section 8 is aimed primarily at providing housing for very low income families, defined as those families "whose annual income is at or below 50% of the median income of the area in which the project is located, adjusted for family size." *Id.* Such families are expected to contribute no more than thirty percent of their adjusted gross monthly income for rent, with Section 8 funds making up the difference between the beneficiary's payment and the local reasonable rent level or the actual rent, whichever is lower.[2] *Id.*; *Catalogue of Federal Domestic Assistance* § 14.871 (Jan. 2004)

---

[1] The Court simply repeats in Sections I(A) and (B) the facts as set forth in the Court's October 3, 2004 Memorandum Opinion ruling on Defendants' Motion to Dismiss.  While the facts cite to Plaintiffs' First Amended Complaint, Plaintiffs' Second and operative Third Amended Complaints simply add new Plaintiffs.  *See* 2d Am. Compl. at 10; 3d Am. Compl. at 11.

[2] Reasonable rent, or "Fair Market Rent" (FMR), is calculated annually for each geographic area, as determined by the OMB.  24 C.F.R. § 888.113(a), 113(d) (West 2004); 24 C.F.R. § 982.503(a) (West 2004).  FMRs "are estimates of rent plus the cost of utilities, except telephone," § 888.113(a), based on a variety of data including the decennial Census, the American Housing Survey, random digit dialing telephone surveys, and other data HUD determines to be accurate.  24 C.F.R. § 888.113(e).  FMRs are generally set at the fortieth percentile of the data for comparable units, although in the case of larger and relatively expensive housing markets FMRs may be set at the fiftieth

("CFDA").  The primary distribution system for Section 8 housing assistance funds is the

Housing Choice Voucher Program ("Voucher Program").  The Voucher Program has a

two-tiered administrative system.  At the national level, the United States Department of

Housing and Urban Development (HUD) oversees distribution of funds appropriated by

Congress.  At the local level, roughly 2600 Public Housing Authorities (PHAs) conduct

eligibility determinations, disbursement of funds, inspections of subsidized housing units,

and related duties.  *See* 42 U.S.C. § 1437f(o) (West 2004); Plaintiffs' Amended

Complaint ("Am. Compl.") ¶ 111.  A PHA is "[a]ny State, county, municipality or other

governmental entity . . . authorized to administer the program," a consortium of such

entities, or, in some limited circumstances, a private non-profit entity.  24 C.F.R. § 982.4

(West 2004).

     The Voucher Program aims to create "a single market-driven program that will

assist in making tenant-based rental assistance more successful at helping low-income

families obtain affordable housing and will increase housing choice for low-income

families."  CFDA § 14.871.  Once issued a voucher, the beneficiary is responsible for

locating a dwelling unit of sufficient quality with a willing owner.  24 C.F.R. 982.1(a)(2)

(West 2004).  If the PHA approves the beneficiary's selection, it contracts directly with

the owner of the unit and makes payments on behalf of the family.  *Id.*  In Fiscal Year

2003, the Voucher Program served approximately 2.1 million clients, disbursing $12.86

billion in rent payments.  CFDA § 14.871.

     PHAs are subject to a number of conditions in connection with their

administration of the Voucher Program.  These conditions are contained in a consolidated

---

percentile.  24 C.F.R. §§ 888.113(b)-113(c).  The results must be published annually in
the Federal Register.  24 C.F.R. § 888.115 (West 2004).

Annual Contributions Contract ("ACC") between HUD and each individual PHA.[3]  The

relevant provisions for the purposes of this case are as follows:

### 2. Funding for HA Certificate or Voucher Program
. . . .
c. By giving written notice to the HA [Housing Authority], HUD
may revise the funding exhibit [statement of funding for a fiscal
year] for a program:
(1) To add a funding increment,[4] or
(2) To remove a funding increment for which the ACC
term has expired.
d. The HUD notice must include a revised funding exhibit,
specifying the term, contract authority [the maximum annual
payment by HUD to the HA for a funding increment irrespective
of funds appropriated by Congress], and budget authority [the
maximum amount of funds actually available for payment to the
HA for a funding increment] for each funding increment under the
consolidated ACC.  The HUD notice of a revised funding exhibit
for a program constitutes an amendment of the consolidated ACC.
. . . .
### 4. HUD Payments for Program
a. HUD will make payments to the HA for a program in
accordance with HUD regulations and requirements.
b. For each HA fiscal year, HUD will pay the HA the amount
approved by HUD to cover:
(1) Housing assistance payments by the HA for the
program.
(2) HA fees for administration of the program.
. . . .
### 5. Maximum Payments for Program
a. **Annual Limit**    Except for payments from the consolidated
ACC reserve account, the HUD annual payments for a program
during a fiscal year must not be more than the sum of the contract
authority amounts for the funding increments in the program.

---

[3] Exhibit 1 to Plaintiffs' Amended Complaint is a standard ACC.  Both parties cite to
clauses from this sample contract in their briefs and neither suggests the language in any
contract applicable to Plaintiffs differs in a legally salient way.  Consequently, the Court
will employ Exhibit 1 as the dispositive version of the ACC for purposes of its decision.

[4] A funding increment is an individual account held by the PHA and funded by HUD.
Am. Compl. Ex. 1, ¶ 1.  The Voucher Program has two funding increments for each
PHA—one for the housing assistance payments and one for the administrative fees.  *See*
Am. Compl. Ex. 3.

    b. **Limit on Payments for Funding Increment**   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

**6. Reduction of Amount Payable by HUD**

    a. If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may reduce to an amount determined by HUD:

        (1) The amount of the HUD payment for any funding increment.

        (2) The contract authority or budget authority for any funding increment.

    b. HUD must give written notice of the reduction.

    c. The HUD notice must include a revised funding exhibit specifying the term, contract authority, and budget authority for each funding increment under the consolidated ACC.  The HUD notice of revisions to the funding exhibit for a program constitutes an amendment to the consolidated ACC.

    . . . .

**9. Budget and Requisition for Payment**

    a. Each fiscal year, the HA must submit to HUD an estimate of the HUD payments for the program.  The estimate and supporting data must be submitted at such a time and in such form as HUD may require, and are subject to HUD approval and revision.

    b. The HA must requisition periodic payments on account of each annual HUD payment.  Each requisition must be in the form prescribed by HUD.  Each requisition must include certification that:

        (1) Housing assistance payments have been made in accordance with the contracts in the form prescribed by HUD and in accordance with HUD requirements; and

        (2) Units have been inspected by the HA in accordance with HUD requirements.

    c. If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD.  Such applications determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year.  The HA must take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to HUD.

**10. HUD Requirements**

    a. The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

b. The HA must comply with its HUD-approved administrative plan, and HUD-approved program funding applications.

. . . .

**11. Use of Program Receipts**

a. The HA must use program receipts [amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program] to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. . . .

b. The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.

c. Interest on the investment of program receipts constitutes program receipts.

d. If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD requirements.

**12. Administrative Fee Reserve**

a. The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:

(1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenditures for the fiscal year, plus

(2) Interest earned on the administrative fee reserve.

b. The HA must use funds in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.

c. If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:

(1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.

(2) Prohibit HA use of administrative fee reserve funds.

Am. Compl. Ex. 1, at 1-3. In addition, PHAs are required to use a financial institution approved by HUD as the depository of program funds, to carry adequate fidelity bond coverage, and to maintain adequate program records. *Id.* at 3.

This case centers around the administrative fees paid to the PHAs to cover the expense of administering the Voucher Program.[5]  Prior to Fiscal Year 2003, all PHAs received a flat percentage of their rental assistance payments as administrative fees, based on the number of vouchers administered.  Departments of Veterans' Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 110 Stat. 2874, 2893 (1996) ("1996 Act") (7.5% for first 600 units, 7% for each additional unit); Consolidated Appropriations Resolution, 117 Stat. 11, 485, at ¶ 5 (2003) ("2003 Act"); Am. Compl. ¶¶ 114, 125; Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss at 10-12.  While HUD regulations provide that "[a]dministrative fees may only be approved or paid from amounts appropriated by the Congress," 24 C.F.R. § 982.152(a)(2), in practice Congress appropriated enough to cover the flat fees, resulting in "stability and predictability in the calculation of the administrative fee," Opp'n to Defs.' Mot. to Dismiss at 12.

If a PHA's administrative fees exceed its actual costs of administering the Voucher Program in a fiscal year, it must deposit the excess in its administrative fee reserve ("Reserve").  24 C.F.R. § 982.155(a); Am. Compl. Ex. 1, ¶ 12(a).  Under both

---

[5] Administrative fees are broken up into two general categories: ongoing administrative fees and special fees.  24 C.F.R. § 982.152 (West 2004); Am. Compl. ¶¶ 114-115. Ongoing administrative fees cover the routine costs of administering the program and make up a fixed proportion of the voucher payments administered by the PHA, as provided by 42 U.S.C. §1437f(q) ("Section 8(q)").  24 C.F.R. §152(b)(1); Am. Compl. ¶ 114.  Since Fiscal Year 2000, these fees have been set by each annual appropriations act at 7.5% for the first 600 units rented per month, and 7% for each additional unit, overriding the provision of Section 8(q) that calls for the Secretary of HUD to take into account the differences in the cost of administering the program in different geographic areas.  *See* 42 U.S.C. § 1437f(q)(1)(c); 1996 Act; 2003 Act at ¶ 5.  Special fees, on the other hand, are paid for various reasons, including serving hard-to-house clients, starting up a voucher program, tenant counseling, and conducting lead-based paint testing.  24 C.F.R. § 152(a)(1)(I); Am. Compl. ¶ 115.  Plaintiffs' Amended Complaint only addresses ongoing administrative fees.

HUD regulations and the terms of the ACC, the PHAs "must first use funds in the administrative fee reserve to pay program administrative expenses in excess of administrative fees paid by HUD for a PHA fiscal year," but, "[i]f funds in the administrative fee reserve are not needed to cover PHA administrative expenses . . . the PHA may use these funds for other housing purposes permitted by State and local law." 24 C.F.R. § 982.155(b)(1); *see also* Am. Compl. Ex. 1, ¶ 12(b).  Many PHAs have accumulated substantial Reserve funds over the years, and have used them for many purposes including affordable housing projects, homeless shelters, rehabilitation of housing stock, services for residents of public housing, and down payment assistance. Am. Compl. ¶ 119.

  B.  *The FY 2003 Appropriations Act*

   Congress, having become "concerned that many PHAs have accumulated significant excess balances in reserve accounts from unspent section 8 administrative fees," H.R. Rep. no. 108-10, at 1370 (2003), decided to alter the administrative fee system in HUD's fiscal year 2003 appropriations.  *See* 2003 Act at ¶ 5.  The 2003 Act required the Secretary of HUD to provide a report "on the administrative costs and other expenses associated with the section 8 voucher program," including "recommendations for changes to the section 8 voucher program administrative fee structure to better align fees with actual costs."  H.R. Rep. no. 108-10, at 1371.  The Act also made two changes to the method of calculating administrative fees for fiscal year 2003.  These changes lie at the heart of the controversy before this Court.[6]

---

[6] The 2003 Act also forbade HUD from using funds to cover so-called "overleasing" by PHAs.  2003 Act at ¶ 1.  Overleasing occurs when PHA efforts to maximize utilization of vouchers result in more beneficiaries than authorized by HUD.  Am. Compl. ¶ 120.  In prior years, HUD had used extra funds from its Section 8 appropriations to provide

First, after appropriating $1.07 billion for administrative fees, the 2003 Act
provided:

> That, notwithstanding any other provision of law or regulation, the amount
> of fiscal year 2003 fee payments otherwise authorized . . . for a public
> housing agency shall be reduced accordingly by any such amounts
> remaining in such agency's administrative fee reserve account as of
> January 31, 2003 which exceed 105 percent of the amount of fees paid to
> such agency from funds made available in fiscal year 2002.

2003 Act at ¶ 5 ("Reduction Provision").  PHAs set to receive $100,000 or less in fiscal

year 2003 were exempted from this provision.  *Id.*  In effect, the Reduction Provision

required PHAs with significantly more than 105 percent of their 2002 fees remaining in

their Reserves to use Reserve funds to cover at least some of their 2003 administrative

costs.  Am. Compl. ¶ 126.

Second, the 2003 Act required the Secretary of HUD to

> recapture any funds provided [for administrative fees] from a public
> housing agency which are in excess of the amounts expended by such
> agency for the section 8 tenant-based rental assistance program and not
> otherwise needed to maintain an administrative fee reserve account
> balance of not to exceed 5 percent

2003 Act at ¶ 5 ("Recapture Provision").  This provision returned the funds that

otherwise would have been deposited in the Reserve—administrative fees in excess of

actual program costs—to the federal government at the end of a PHA's fiscal year,

providing the PHA had a Reserve balance equal to more than five percent of its 2002

fees.  Am. Compl. ¶ 130.

---

assistance payments for overleased tenants.  *Id.*  None of Plaintiffs' claims rely on this
provision.

The 2003 Act was passed on February 20, 2003, but HUD implementation did not begin immediately.[7]  Am. Compl. ¶¶ 122, 131.  In letters dated April 30, 2003, HUD announced that it would begin lowering monthly budget authority for PHAs pursuant to the Reduction Provision.  *Id.* at ¶ 131; Am. Compl. Ex. 3.  Despite this announcement, HUD continued to pay PHAs the full amount of administrative fees through August 2003.  Am. Compl. ¶ 132.

On August 14, 2003, HUD informed PHAs that actual adjustment of the administrative fees would "begin with the September 2003 payment" and that "[t]he September payment could reflect a lump sum reduction amount to adjust for previous fee disbursements released for the May, June, July, and August payments."  *Id.* at ¶ 133. HUD told affected PHAs how large their funding cuts would be over the telephone in late August.  *Id.* at ¶ 134.  HUD provided written notice of the cuts only after the payments were received, although the letters were backdated to August 28, 2003.  *Id.* at ¶ 138; Am. Compl., Ex. 5.  HUD finally published an official notice of its implementation on September 22, 2003, just eight days before the end of federal fiscal year 2003.  *See* Am. Compl. Ex. 6 (Notice PIH 2003-23).

On September 10, 2004, Plaintiffs notified the Court of an additional action by HUD.  On August 26, 2004, HUD's Financial Management Center issued a bulletin modifying HUD's policy on implementation of the Reduction Provision.  This bulletin stated that:

> When the adjustments were first made by HUD, they were applied for the months of May through December, 2003.  HUD attorneys have determined that Congress intended the adjustment to be applied to all

---

[7] Until the final appropriations were settled, the Voucher Program was funded at fiscal year 2002 levels through continuing appropriations acts.  Am. Compl. ¶¶ 147-48.

> funding during calendar year 2003.  This is a change to what was
> previously communicated to affected HAs.  Accordingly, adjustments will
> have to be applied retroactively for the months of January through April,
> 2003.

Pls.' Mot. for Leave to File Supp. Opp. [16], Ex. 1 (Financial Management Center

Bulletin) at 1.

> C.      *HUD's Final Implementation of the Reduction and Recapture Provisions*

On May 9, 2005, the General Deputy Assistant Secretary for Public and Indian

Housing approved a recommendation regarding a further "revised implementation of the

Section 8 HCV program administrative fee provisions of the Fiscal Year 2003

Appropriations Act . . . ."[8]  This "Revised Implementation of the Housing Choice

Voucher Program Administrative Fee Reduction and Recapture Provisions of the Fiscal

Year 2003 Appropriations Act" was finally fully set forth in HUD Notice PIH 2005-30

(HA), issued on August 5, 2005.  Defs.' Mot. for Summ. J., Ex. 1 (hereinafter, "2005

Notice").[9]  "This Notice supersedes all other HUD policies and procedures on the

_____

[8]  HUD filed the Administrative Record of this "final decision concerning the
implementation of the 2003 Appropriations Act provisions relating to administrative fee
funding for the Section 8 Housing Choice Voucher Program" with this Court on May 10,
2005.  *See* [28] 5/10/2005 Administrative Record, Notice of Filing & Designation and
Certification by David Vargas, Director, Office of Housing Choice Voucher Program,
HUD.  The Administrative Record includes a Memorandum which "sets forth . . .  the
Department's revised implementation of the Section 8 HCV program administrative fee
provision . . . based on changes to how the Department is interpreting the statute."
Administrative Record at 1, 4/29/05 Mem. from Milan Ozdinec, Acting Deputy Assistant
Secretary for Public Housing and Voucher Programs, PE, to Paula O. Blunt, General
Deputy Assistant Secretary for Public and Indian Housing (hereinafter "Final
Implementation Mem.").

[9]  The Court notes that the expiration date for the 2005 Notice is listed as August 31,
2006, on the first page of the 2005 Notice itself.  However, given that the Parties have not
indicated to the Court that HUD has further revised its implementation of the 2003 Act,
and given that the 2005 Notice was intended to "serv[e] as a correction and revision to
the previously published Financial Management Center (FMC) Bulletin #07-04,
published August 26, 2004[,]" and "superced[e] the information provided on

implementation of the administrative fee payment reductions and recaptures required by the 2003 Act, including the information provided on administrative fee payment reductions and recaptures contained in HUD Notice PIH 2003-23." *Id.* at 2.

HUD's final implementation calculates Reductions using a four-step process:

Step 1:  Calculate fees 8(q) pre-QHWRA for the period 1/1/2002 through 12/31/2002.

Step 2:  Compile administrative fee reserve balances as reported by PHAs as of 1/31/2003.

Step 3:  Calculate fees 8(q) pre-QHWRA for the period 2/20/2003 through 12/31/2003.

Step 4:  If the administrative fee balance as of January 31, 2003 as compiled in Step 2 above, exceeds 105 percent of the calendar year 2002 fee amount calculated in step 1, above, AND the administrative fee amount calculated in step 3, above, for a PHA for the period 2/20/2003 through 12/31/2003 exceeds $100,000, then reduce such administrative fee amount calculated in step 3, above, for the PHA by such excess amount, but only up to and not exceeding the administrative fee amount calculated in step 3, above, for the PHA.

*Id.* at 5 ("Attachment").

HUD's final implementation calculates Recaptures using a six-step process:

Step 1:  Calculate fees 8(q) pre-QHWRA for the period 5/1/2003 through 12/31/2003.

Step 2:  Calculate fees after reduction.

Step 3:  Obtain administrative expenses from Voucher Management System (VMS) for the same measurement period (5/1/2003 through 12/31/2003).

Step 4:  Calculate excess funding for the period 5/1/2003 through 12/31/2003.

---

administrative fee payment reductions and recaptures contained in HUD Notice PIH 2003-23," the Court understands the 2005 Notice to set forth the current HUD approach to implementing the 2003 Act.

Step 5:  Calculate 5 percent of fees calculated in step 1, above.

Step 6:  Compare the 5 percent threshold to the beginning reserve balance and determine the portion of excess funding to be recaptured, if any.

*Id.* at 6.

These calculations differ in several respects from HUD's previous implementations.  Specifically:

(1)  HUD now calculates the excess reserve amount by comparing a PHA's administrative fee reserves as of January 31, 2003, with the amount of fees paid to the PHA between January 1, 2002 and December 31, 2002 (*i.e.*, calendar year 2002) instead of with the amount of fees paid to the PHA between October 1, 2001 and September 30, 2002 (*i.e.*, federal fiscal year 2002).  *Id.* at 3.  HUD justifies this change as follows: "Since the Housing Choice Voucher program has been funded on a calendar year basis, it has been determined that the reduction provision, including the calculation of the excess AF reserve amount, should also be applied on a calendar year basis."  *Id.*

(2) HUD now reduces fee payments obligated between February 20, 2003 (the date of the 2003 Act's enactment) and December 31, 2003, having determined that the reduction provision should be applied on a calendar year basis but only from the effective date of the 2003 Act.  Furthermore, "[t]he reduction provision applies from the effective date of the 2003 Act until the end of the 2003 calendar year funding cycle, *regardless of the source of funds used during that time to make the administrative fee payments*."  *Id.* at 3 (emphasis added).  According to the 2005 Notice, "[u]nlike the second and fifth provisos in the administrative fee paragraph in the 2003 Act, there is no language that explicitly ties the reduction provision to the money made available by the 2003 Act."  *Id.*

(3) HUD now applies the Reduction Provision to PHAs that were paid more than $100,000 in fees between February 20, 2003, and December 31, 2003–when previously, HUD applied the Reduction Provision to PHAs "that were paid more than $100,000 in fees for Federal fiscal year 2003." *Id.* at 4. According to HUD, "[a]gain, although the reduction provision, including this related proviso, will be applied on a calendar year basis, it will apply only prospectively from the effective date of the 2003 Act (February 20, 2003) forward, since the statutory language does not require retroactive application to the beginning of the calendar year." *Id.*

(4) HUD now intends to implement the Recapture provision to the time period during which funds provided under the 2003 Act were made available–specifically, between May 1, 2003, and December 31, 2003. HUD explains its rationale as follows:

> HUD previously intended to implement the recapture (fifth) proviso of the administrative fee paragraph in the 2003 Act (and in a very few cases did implement it) based on the full 2003 calendar year. However, this proviso, like the second proviso of the administrative fee paragraph, contains language that explicitly ties the requirement for the fee recapture to the money made available by the 2003 Act, and the only time period during which funds provided under the 2003 Act were paid to PHAs for administrative fees was between May 1 and December 31, 2003. Accordingly, HUD has determined that the recapture provision should apply only to fees and expenses during that time period.

*Id.*

D.   *Procedural History*

Plaintiffs, both PHAs and umbrella organizations, filed a complaint against HUD and its Secretary on July 7, 2003, first amended on September 29, 2003, alleging that: (1) classification of PHAs based on the amount of Reserve funds they held as of January 31, 2003 "constitutes a violation of the Equal Protection component of the Fifth Amendment of the U.S. Constitution;" (2) HUD's implementation of the Reduction and Recapture

Provisions constitutes an unconstitutional taking of the PHAs' property in (a) the administrative fees to which they are "entitled pursuant to section 8(q) of the 1937 [Housing] Act," (b) the Administrative Fee Reserve, and (c) the "contractual right to add the administrative fees . . . to [the] Reserve;" (3) HUD's implementation of the Reduction and Recapture Provisions deprives the PHAs of unrestricted use and enjoyment of their property in violation of the Due Process Clause of the Fifth Amendment of the Constitution; (4) HUD's reduction and recapture of administrative fees breached the parties' ACC contract; (5) HUD's implementation of the Reduction and Recapture Provisions, including HUD's "retroactive" application of the Reduction Provision is a violation of the APA.  Am. Compl. ¶¶ 150-191.

Defendants filed a Motion to Dismiss on November 20, 2003, which was subsequently fully briefed.  On September 30, 2004, the instant Court issued an Order (and an accompanying Memorandum Opinion on October 4, 2004), dismissing in full Plaintiffs' equal protection claim and dismissing without prejudice Plaintiffs' breach of contract claims in excess of $10,000 in value to allow Plaintiffs to re-file before the Court of Federal Claims (which would properly have jurisdiction over such claims).  The Court also narrowed Plaintiffs' Takings and Due Process claims such that the following specific claims survived Defendants' Motion to Dismiss: 1) Plaintiffs' Takings claim based on its alleged contractual right to its administrative fee reserve; 2) Plaintiffs' APA claim; and 3) Plaintiffs' due process challenge to the retroactive application of the funding reductions for the months of January through April, 2003.

Plaintiffs filed a Second Amended Complaint (which simply added additional Plaintiffs) on April 18, 2005.  Plaintiffs and Defendants filed the cross Motions for

Summary Judgment presently before the Court on October 24, 2005, ("Pls.' Mot. for Summ. J."; "Defs.' Mot. for Summ. J."), both of which were followed by Oppositions and Replies.  While Plaintiffs subsequently filed a Third Amended Complaint without opposition on August 17, 2006, "for the purpose of adding ten additional housing authorities as plaintiffs," "[t]he parties have agreed that all of the plaintiffs, including the ten new plaintiffs, will be bound by the Court's decision on the cross-Motions for Summary Judgment that are pending before the Court.  We have also agreed that no additional briefing on those motions will be required as a result of the filing of the Third Amended Complaint."  3d Am. Compl., Ex. A (Letter from John R. Griffiths to Raymond K. James and Carl Coan III).  In light of this statement and in the interests of judicial economy, the Court will cite to either the First, Second, or Third Amended Complaints–which contain the same claims and are amended by the inclusion only of additional Plaintiffs–as it sees fit, based on prior references in its Opinion on the Motion to Dismiss (which refers to the First Amended Complaint) and/or the Court's review of the Second Amended Complaint prior to the filing of the Third Amended Complaint.

## II: LEGAL STANDARD

### A.     *Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations and quotations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Instead, while the movant bears the initial responsibility of identifying those portions of

the record that demonstrate the absence of a genuine issue of material fact, the burden

shifts to the non-movant to "come forward with 'specific facts showing that there is a

*genuine issue for trial.*'" *Id.* at 587, 106 S. Ct. 1348 (citing Fed. R. Civ. P. 56(e))

(emphasis in original).

       B.      *Standards for Administrative Agency Review*

      Plaintiffs in this case challenge HUD's interpretation of the Fiscal Year 2003

Appropriations Act, specifically, the Agency's interpretation of the Reduction and

Recapture Provisions.  The standard for the Court's review of such challenges is known

as *Chevron* review, after the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural*

*Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  The

central question for the reviewing court under *Chevron* "is whether the agency's

construction of the statute is faithful to its plain meaning, or, if the statute has no plain

meaning, whether the agency's interpretation 'is based on a permissible construction of

the statute.'"  *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467

U.S. at 843, 104 S. Ct. 2778).  Under the *Chevron* analysis, a court first asks "whether

Congress has directly spoken to the precise question at issue.  If the intent of Congress is

clear, that is the end of the matter; for the court, as well as the agency, must give effect to

the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43, 104 S.

Ct. 2778; *see also id.* at 843 n.9 ("[A]dministrative constructions which are contrary to

clear congressional intent" must be rejected by the court).  "When performing this first

step, [courts] employ traditional tools of statutory construction."  *Indep. Ins. Agents of*

*Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842–43, 104 S. Ct. 2778; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 107 S. Ct. 1207, 1221, 94 L. Ed. 2d 434 (1987)).  Among these tools is a statute's framework and legislative history.  *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 172 (D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 134 (D.D.C. 1999); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n*, 46 F.3d 1173, 1178 (D.C. Cir. 1995)).  However, canons of construction are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in question." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir. 1989) (emphasis in original).  In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *AFL-CIO*, 333 F.3d at 173.

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S. Ct. 2778.  "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO*, 333 F.3d at 173.  "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the

court would have reached if the question initially had arisen in a judicial proceeding."

*Chevron*, 467 U.S. at 843 n.11, 104 S. Ct. 2778.

> When a challenge to an agency construction of a statutory provision, fairly
> conceptualized, really centers on the wisdom of the agency's policy, rather than
> whether it is a reasonable choice within a gap left open by Congress, the
> challenge must fail. In such a case, federal judges-who have no constituency-have
> a duty to respect legitimate policy choices made by those who do. The
> responsibilities for assessing the wisdom of such policy choices and resolving the
> struggle between competing views of the public interest are not judicial ones:
> "Our Constitution vests such responsibilities in the political branches."

*Id.* at 866, 104 S. Ct. 2778 (quoting *TVA v. Hill*, 437 U.S. 153, 195, 98 S. Ct. 2279, 2302,

57 L. Ed. 2d 117 (1978)).  However, if the Agency's interpretation unduly compromises

the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and it

would therefore not be entitled to deference."  *Orloski v. Fed. Election Comm'n*, 795

F.2d 156, 164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845, 104 S. Ct. 2778); *see*

*also Chevron*, 467 U.S. at 845, 104 S. Ct. 2778 (providing that if the agency's "choice

represents a reasonable accommodation of conflicting policies that were committed to the

agency's care by the statute, we should not disturb it unless it appears from the statute or

its legislative history that the accommodation is not one that Congress would have

sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S. Ct. 1554, 1560,

6 L. Ed. 2d 908 (1961)); *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391,

1396 (D.D.C. 1987) ("[W]here the agency interprets its statute in a way that flatly

contradicts Congress's express purpose, the court may – indeed must – intervene and

correct the agency.").

## III: DISCUSSION

The Court will consider Plaintiffs' remaining claims–their (1) Takings claim, (2) APA claim, and (3) Due Process challenge to the retroactive application of funding reductions for the months of January through April, 2003–in turn.

A.      Takings Claim

In Count II of their Second Amended Complaint, Plaintiffs claim that "Defendants' implementation of the Reduction and Recapture Provisions, each and both, constitutes an unlawful taking of the property of the Plaintiffs in violation of the Fifth Amendment of the U.S. Constitution."  2d Am. Compl. ¶ 176.  Plaintiffs claim a property interest in (1) their Administrative Fee Reserve, and (2) their "contractual right to add the administrative fees that they do not spend on administering the Program to their Reserve."  2d Am. Compl. ¶¶ 171-174.[10]  For the reasons that follow, the Court concludes that neither of these alleged property interests is "private property" protected by the Fifth Amendment.

The Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation."  U.S. Const., amend. V.  The threshold inquiry in a takings analysis is to determine if the claimant has a property interest protected by the

---

[10] Prior to this Court's issuance of its Order and Memorandum Opinion with respect to Defendants' Motion to Dismiss, Plaintiffs already argued that they had a property interest in administrative fees "to which [they are] entitled pursuant to section 8(q) of the 1937 [Housing] Act."  *See* 2d Am. Compl. ¶ 171.  This Court dismissed that claim, explaining that "Plaintiffs' claim of statutory entitlement [to administrative fees] cannot serve as a basis for their due process and takings claims" because the levels of administrative fees are set by annual appropriations acts, and "Congress has plenary power to define the scope and duration of the entitlement" in its appropriations.  *See* Mem. Opinion at 45-47 (citing *Atkins v. Parker*, 472 U.S. 115, 129, 105 S. Ct. 2520, 2529, 86 L. Ed. 2d 81 (1985)); *see also* Pls.' Opp'n to Defs.' Mot. for Summ. J. at 13-14 ("Plaintiffs do not [in their Second Amended Complaint] assert a property interest in the calculation of the fee nor do they need to in order to sustain a taking claim").

Fifth Amendment.  *See Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 55, 106 S. Ct. 2390, 2397-98, 91 L. Ed. 2d 35 (1986); *Great Lakes Higher Educ. Corp. v. Cavazos*, 911 F.2d 10, 14–15 (7th Cir. 1990) (citing *United States v. General Motors Corp.*, 323 U.S. 373, 377-78, 65 S. Ct. 357, 359-60, 89 L. Ed. 311 (1945)).  Property interests "are created and their dimensions are defined by existing rules or understandings" arising from non-Constitutional sources.  *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972).  Generally, "a holder of private property enjoys the right of 'free use, enjoyment, and disposal.'"  *Great Lakes*, 911 F.2d at 14 (quoting *Buchanan v. Warley*, 245 U.S. 60, 74, 38 S. Ct. 16, 18, 62 L. Ed. 149 (1917)).  As a corollary to the general rule that a plaintiff must prove all elements of his case to prevail, a plaintiff in a takings action bears the burden of establishing a compensable property interest.  *Page v. United States*, 51 Fed. Cl. 328, 336 (2001) (citing *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed. Cir. 1993)).

Applying this framework to the instant case, it is clear that Plaintiffs have no compensable property interest in either the Administrative Fee Reserve or the contractual right to add unspent administrative fees to the Reserve, because the PHAs lack sufficient control over the funds to "own" them under any reasonable definition of that term. Plaintiffs' Takings claim in this case is outside the bounds of any precedent finding a Fifth Amendment taking.

       1.      <u>Plaintiffs' Property Interest in the Administrative Fee Reserve</u>

Pursuant to the terms of their Annual Contributions Contract ("ACC") with HUD, PHAs "must maintain an administrative fee reserve for a [Section 8 Certificate or

Voucher] program." 2d Am. Compl., Ex. 1 (standard ACC) ¶ 12(a). According to the ACC, PHAs must deposit in the Reserve "(1) . . . administrative fees paid by HUD for a fiscal year [which] exceed HA administrative expenditures for the fiscal year, plus (2) Interest earned on the administrative fee reserve." *Id.* The Reserve funds "must" be used, if necessary, "to pay administrative expenses in excess of program receipts." *Id.* ¶ 12(b). However, "[i]f any funds remain in the administrative fee reserve," after paying administrative expenses, "the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law." *Id.*[11] The HA must use all program receipts "to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. . . ." *Id.* ¶

---

[11] Plaintiffs briefly dispute the characterization of paragraph 12(b) of the ACC. *See* Pls.' Mem. for Summ. J. at 15. Plaintiffs argue that "[a]lthough paragraph 12 provides that a use of funds in a reserve is to pay for administrative expenses in excess of fee income during a year, by no stretch could both parties to the contract have intended or agreed that this shortfall provision would be used by one of the parties in a deliberate and targeted manner to create a shortfall for a limited number of fee recipients, rather than be used to cover customary fluctuations in administrative costs. . . ." *Id.* Essentially, Plaintiffs argue that paragraph 12(b)'s subordination of state programs to administrative fees in using the Administrative Fee Reserve should not apply if Congress unexpectedly reduces administrative fee payments for some PHAs. This contention fails for several reasons. First, Plaintiffs' characterization is not reasonable. The ACC is unambiguous. It directs that "[i]f any funds remain in the administrative fee reserve," after paying administrative expenses, "the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law." ACC ¶ 12(b). PHAs agreed to the provision when signing the contract, regardless of their expectations about when or under what circumstances a shortfall might arise. Changes in congressional entitlement programs through appropriations measures can hardly be unexpected. In addition, the ACC expressly requires that "[t]he HA must comply, and must require owners to comply, with . . . any amendments or changes in the law or HUD requirements." *Id.* ¶ 10(a). It is simply unreasonable to give paragraph 12(b) a reading that directly contradicts its express text. Even assuming *arguendo* that Plaintiff's characterization were colorable (which it is not), it is not material to the Court's decision–if Plaintiffs' characterization of the ACC were accepted, the Reserve funds would still be restricted to paying for low-income housing programs in compliance with Section 8 program goals such that they would not be considered Plaintiffs' private property, for reasons elaborated below.

11(a).[12]  Consistent with these requirements, many PHAs have used excess Reserve funds over the years for many purposes, including development of affordable housing projects, development of homeless shelters, preservation of affordable housing through the purchase and rehabilitation of apartment projects, services for residents of public housing, and homeownership down payment assistance.  2d Am. Compl. ¶ 132.

Plaintiffs attempt to demonstrate in several ways how, under the above scheme, they exercise sufficient control over Reserve funds to transform the funds into their private property.  First, Plaintiffs argue that "[o]nce a PHA puts funds in its reserve it can immediately spend a part or even all of the reserve for other housing purposes permitted by its local charter. . . ."  Pls.' Mem. for Summ. J. at 14.  Second, Plaintiffs maintain that a "PHA can put its administrative fee reserves in a bank account over which it has complete control."  *Id.*  Third, Plaintiffs note that HUD's Choice Voucher Program Guidebook 7420.10G, ¶ 20.10 (April 2001) states that "[i]nterest earned on administrative reserves is interest earned on funds that belong to the PHA [and] may be retained by the PHA."  *Id.* at 13.  Finally, Plaintiffs consistently attempt to cast themselves as similar to for-profit ventures, who "earn" fees "in return for their administering" HUD's Section 8 program.  2d Am. Compl. ¶ 127.  The Reserve, Plaintiffs imply, is similar to the net profit of a corporation, because the PHAs "do not need HUD's approval to use all or a part of their reserves for other housing purposes of their choice."  Pls.' Mem. for Summ. J. at 16.

---

[12]  Plaintiffs do not claim a right to use (and in practice have not used) the Reserve for anything other than paying administrative fees and funding programs that further the overall goals of the Section 8 program as stated in ACC ¶ 11(a).  *See* 2d Am. Compl. ¶ 132.

The degree of control the PHAs exercise over their Administrative Fee Reserves is not sufficient to transform the Reserves into their private property.  Plaintiffs are not free to spend the Reserve funds as they wish, but instead must spend them "to pay administrative expenses in excess of program receipts."  ACC ¶ 12(b).  Hence the concept of an "Administrative Fee Reserve."  True, the PHA exercises *some* degree of control over the Reserve:  if, and only if, "any funds remain in the administrative fee reserve," after paying administrative expenses, "the HA may use the administrative reserve funds for other *housing purposes* if permitted by State and local law."  *Id.* (emphasis added).  The critical difference between a company's profit and a PHA's Administrative Fee Reserve is that a company can spend its profit as it chooses, while a PHA holding a Section 8 housing program Administrative Fee Reserve can spend the funds only on administrative fees, and if excess funds remain, then only on low income housing programs in compliance with the U.S. Housing Act of 1937 and HUD requirements.  Such programs are not for the PHA's private financial benefit, but instead benefit a segment of the public – low income individuals in need of affordable housing. In other words, while a company "enjoys the right of 'free use, enjoyment, and disposal'" of its profit, PHAs enjoy only tightly restricted use, for others' and not their own enjoyment, and disposal in compliance with the U.S. Housing Act of 1937 and HUD requirements, of the Administrative Fee Reserve.  *Great Lakes*, 911 F.2d at 14 (quoting *Buchanan*, 245 U.S. at 74, 38 S. Ct. 16).  Thus, the Administrative Fee Reserve funds are neither "private," nor the PHAs' "property" "under any reasonable definition of [those] term[s]."  *See Ohio Student Loan Comm'n. v. Cavazos*, 900 F.2d 894, 899 (6th Cir. 1990) ("*OSLC*").

Plaintiffs' explanations as to how they allegedly exercise sufficient control over the Administrative Fee Reserve to transform it into their private property fall flat. Once a PHA puts funds in the Reserve, it may be able to "immediately spend a part or even all of" it, but only on housing purposes to benefit the public within the confines of the Section 8 program. Pls.' Mem. for Summ. J. at 14. HUD may have written in its Choice Voucher Program Guidebook that the Administrative Fee Reserve "belong[s]" to a PHA, but that statement does not affect a PHA's legal rights of control over the funds, and must be interpreted in context. *See id.* at 13. The funds "belong" to the PHA only in the sense that they are under the PHA's administration.

The Guaranteed Student Loan Program (GSLP) cases are controlling here.[13] In these cases, state agencies administering the GSLP under the Higher Education Act of 1965 had accumulated reserves from administrative cost allowances they had received as a "contractual right." *See OSLC*, 900 F.2d at 896-97. The reserve fund could "only be used for those GSLP purposes specified by the Secretary [of Education]." *South*

---

[13] Standard Takings cases (and related breach of contract cases) where, absent the challenged government action, plaintiffs would retain a recognized property interest, do not illuminate the issues raised in this case. *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996) (finding that the government breached its contract with financial institutions when it changed accounting rules, resulting in monetary damages to institutions); *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998) (finding an unconstitutional taking of IOLTA account interest income); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980) (finding an unconstitutional taking of interpleader fund interest income). But for the challenged government actions in those cases, plaintiffs would possess larger amounts of private funds fully under their control. In contrast, but for Congress's enactment and HUD's implementation of the challenged statutory provisions in this case, Plaintiff PHAs would only have larger amounts of Section 8 Housing Program funds under their administration. The Court also notes that because Plaintiffs have no protected property interest, irrespective of whether Defendants breached or altered the ACC contracts, it is unnecessary to examine under the unsettled rubric of the "unmistakability doctrine" whether the government "unmistakably" waived its right to alter the contracts.

*Carolina State Educ. Assistance Auth. v. Cavazos*, 897 F.2d 1272, 1274 (4th Cir. 1990) ("*SCSEAA*"). In 1987, Congress demanded that agencies with "excess" reserves transfer the excess to the Secretary of Education. The agencies claimed an unconstitutional taking of their property under the Fifth Amendment.

Every circuit to confront the agencies' claims rejected them. *See Rhode Island Higher Educ. Assistance Auth. v. Secretary, U.S. Dep't of Educ.*, 929 F.2d 844, 852 (1st Cir. 1991); *SCSEAA*, 897 F.2d at 1274; *Great Lakes*, 911 F.2d at 14; *OSLC*, 900 F.2d at 899. *See also Ass'n of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859, 867 (D.C. Cir. 1992). In *OSLC*, the Sixth Circuit explained that:

> In the instant case, though the OSLC retains some control over the [reserve] funds, its role is akin to that of a trustee. The OSLC does not "own" the funds under any reasonable definition of that term. It is the administrator of the funds which flow in and out of Ohio as part of the GSLP program. The OSLC is a public entity that is not interested in making any sort of profit in its administration of the program. Instead, it has chosen to join with the federal government to administer the GSLP program, knowing that the funds are ultimately to be disposed of according to the decisions of the federal government.

900 F.2d at 899-900. The Sixth Circuit concluded that because "there are significant federal limitations upon receipt and use of the funds," "we hold that the excess reserves do not constitute private property." *Id.*

Similarly, in *Great Lakes*, the Seventh Circuit stated that:

> Federal law regulates the reserve fund extensively and it exists because of a federal mandate. 34 C.F.R. § 682.410(a)(1). Moreover, its sources are substantially from the federal government and the uses to which it may be put are restricted to [uses associated with the GSLP program] . . . The purpose and legal structure of Great Lakes places it in that borderline between the wholly public and wholly private instrumentality. . . .

> Congress intended the GSLP to assist needy persons in their quest for advanced educational opportunities. We find no indication that Congress

27

> meant for the reserve fund excesses to be irrevocably committed to the
> guarantee agencies.

911 F.2d at 14-15 (internal citation omitted).  The Seventh Circuit therefore concluded

"that the reserve fund excess is not 'private property' for purposes of the Fifth

Amendment."  *Id.*

Plaintiffs attempt to distinguish the GSLP cases from the instant case, positing

that "[t]he key difference between the GSLP reserve and the Voucher Program

administrative fee reserves is that the GSLP reserves can only be used for GSLP

purposes, while the PHA administrative fee reserve can be used extensively for non-

program purposes."  Pls.' Opp'n to Defs.' Mot. for Summ. J. at 19.  True, the PHAs in

the instant case enjoy a modicum of greater flexibility in applying the reserve funds than

did the entities in the GSLP cases.  This flexibility results from HUD's stipulation in

ACC ¶ 12(b) that funds remaining in the Administrative Fee Reserve may be used for

other housing purposes in order to further the goals of the Section 8 program.  This

provision allows PHAs to use Reserve funds to create innovative and successful

programs to further the overall goals of the Section 8 program.  The funds were,

however, at all times restricted for "housing purposes" in compliance with Section 8's

goals.  The case might be different, if, as Plaintiffs suggest, the administrative fees were

"paid" to the PHAs in return for a service, and once paid became the PHAs' profit, to be

disposed of with complete discretion for their enjoyment.  Such, however, is not the case

here.  As in *Great Lakes*, 911 F.2d at 15, Congress allocated the funds to assist needy

persons, partnering with state and local agencies to administer the program.  As in the

GSLP cases, this Court "find[s] no indication that Congress meant for the reserve fund

excesses to be irrevocably committed to the" PHAs.  *Id.*

In short, there exists a spectrum of control over funds held by an entity. At one end, an entity exercises complete control over its profit. At the other end, a fiduciary administers funds for others' benefit. In this case, Plaintiffs fall squarely at the fiduciary end – a far cry from raising any serious question as to whether the funds are their private property. Accordingly, the Court concludes that the Administrative Fee Reserve does not constitute "private property" protected by the Fifth Amendment.

   2. <u>Plaintiffs' Property Interest in the "contractual right to add administrative fees that they do not spend on administering the Program to their Reserve"</u>

Besides claiming a property interest in the Administrative Fee Reserves, Plaintiffs claim that their "contractual right to add the administrative fees that they do not spend on administering the Program to their Reserve . . . constitutes a fundamental property interest." 2d Am. Compl. ¶ 174. The Court has already concluded that Plaintiffs do not have a property interest in either the administrative fees, *see supra* note 10, nor in the Administrative Fee Reserve, *see supra* Section III(A)(1). As such, it would be strange at this stage to find a property interest in a right to place administrative fees into the Administrative Fee Reserve. Upon closer examination, Plaintiffs' alleged property interest in the "contractual right to add [unspent] administrative fees" to the Administrative Fee Reserve reveals itself simply as an assertion of a property interest in the Administrative Fee Reserve itself, based on contractual guarantees. The possible bases for Plaintiffs' right to the Reserve, including contractual guarantees under the ACC, were discussed in Section III(A)(1) and found unavailing. Accordingly, the Court finds that Plaintiffs have no property interest protected by the Fifth Amendment in the

"contractual right to add the administrative fees that they do not spend on administering the Program to their Reserve."

For the foregoing reasons, the Court concludes that neither (1) the Administrative Fee Reserve, nor (2) the contractual right to add unspent administrative fees to the Reserve, constitutes "private property" protected by the Fifth Amendment. Plaintiffs' Fifth Amendment Takings claim therefore fails at the threshold inquiry stage – Plaintiffs have failed to establish a property interest protected by the Fifth Amendment. As such, Plaintiffs' Fifth Amendment Takings claim shall be dismissed.

> B.     *APA Claim*

In Count VI of their complaint, Plaintiffs claim that "Defendants' implementation of Paragraph 5 [of the Fiscal Year 2003 Appropriations Act] is arbitrary, capricious, not in accordance with law. . . ." 2d Am. Compl. ¶ 200. More specifically, in their Motion for Summary Judgment, Plaintiffs argue that HUD's implementation of the Reduction Provision is arbitrary, capricious, and an abuse of discretion. *See* Pls.' Mem. for Summ. J. at 32.

The Fiscal Year 2003 Appropriations Act states, in relevant part:

> For activities and assistance under the United States Housing Act of 1937, as amended (42 U.S.C. 1437 et seq.) ("the Act" herein), not otherwise provided for, $17,223,566,000, and amounts that are recaptured in this account, to remain available until expended: . . . Provided further, That amounts made available under this heading are provided as follows: . . .
>
> ([paragraph] 5) not to exceed $1,072,257,000 for administrative and other expenses of public housing agencies in administering the section 8 tenant-based rental assistance program, of which $69,547,000 is for such expenses associated with section 8 tenant-based assistance provided under this heading in paragraphs (2) and (3): [1] Provided, That, the fee otherwise authorized under section 8(q) of the Act shall be determined in accordance with section 8(q), as in effect immediately before the

> enactment of the Quality Housing and Work Responsibility Act of 1998:
> [2] Provided further, That none of the funds made available in this
> paragraph shall be provided to any public housing agency unless such
> agency reports to the Secretary the amounts remaining available as of
> January 31, 2003 in such agency's administrative reserve fee account: [3]
> Provided further, That, notwithstanding any other provision of law or
> regulation, the amount of fiscal year 2003 fee payments otherwise
> authorized pursuant to the first proviso in this paragraph for a public
> housing agency shall be reduced accordingly by any such amounts
> remaining in such agency's administrative fee reserve account as of
> January 31, 2003 which exceed 105 percent of the amount of fees paid to
> such agency from funds made available in fiscal year 2002: [4] Provided
> further, That the preceding proviso shall not apply to any public housing
> agency if the amount of fiscal year 2003 fee payments otherwise
> authorized to be provided to such agency pursuant to the first proviso in
> this paragraph does not exceed $100,000: [5] Provided further, That,
> hereafter, the Secretary shall recapture any funds provided in this
> paragraph from a public housing agency which are in excess of the
> amounts expended by such agency for the section 8 tenant-based rental
> assistance program and not otherwise needed to maintain an
> administrative fee reserve account balance of not to exceed 5 percent . . .

Pub. L. No. 108-7, 117 Stat. 11.  For clarity, the Court has assigned bracketed numbers to

the provisions: the "Reduction Provision" is provision [3], whereas the "Recapture

Provision" is provision [5].

Plaintiffs take issue with both HUD's defining the term "fiscal year" as used in

the Act as the calendar year, as well as HUD's application of the Reduction Provision

([3]) to funds made available to PHAs in calendar year 2003 regardless of their source

(i.e., HUD's application of the Reduction Provision to payments made using Federal

Fiscal Year 2002 Appropriations Act funds during February (after February 20), March,

and April of 2003).  The Court shall address these two issues in turn.

    1.     HUD erroneously interprets "fiscal year" in its implementation of
             the 2003 Act

In its final implementation, HUD consistently interprets "fiscal year" to mean

calendar year.  For example, HUD interprets "fiscal year 2003 fee payments otherwise

authorized pursuant to the first proviso in this paragraph" as payments to be made within the period from February 20, 2003, the date of enactment of the 2003 Act, to December 31, 2003, the end of calendar year 2003.  HUD explains that it chose to apply the Reduction Provision on a calendar year basis because "Congress did not specify [] whether it was referring to the federal fiscal year, PHAs' fiscal years (which vary), or some other period of time. . . . [and because] the Section 8 Housing Choice Voucher program has been funded on a calendar year basis . . .  HUD has determined that the reduction provision also should be applied on a calendar year basis."  Defs.' Mem. for Summ. J. at 19 (internal quotation marks omitted).  The Court notes that HUD applies the Reduction Provision "only prospectively from the effective date of the 2003 Act (February 20, 2003) forward," because "the statutory language does not require retroactive application to the beginning of the calendar year."  2005 Notice at 3.

HUD's allegedly "prospectiv[e]" application of the Reduction Provision does not excuse its impermissible interpretation of the term "fiscal year" as set forth in the 2003 Act.  In Defendants' filings, Defendants essentially skip the first prong of *Chevro*n, arguing largely that HUD's interpretation of the 2003 Act is reasonable.  However, the Court finds that "fiscal year" in the Federal Fiscal Year 2003 Appropriations Act unambiguously refers to the federal fiscal year.

Pursuant to 31 U.S.C. § 1102, "[t]he fiscal year of the Treasury begins on October 1 of each year and ends on September 30 of the following year."  31 U.S.C. § 1102. Paragraph 5 of the 2003 Act comes from Congress's Consolidated Appropriations Resolution, 2003, captioned as a "Joint Resolution Making consolidated appropriations for the fiscal year ending September 30, 2003, and for other purposes."  Pub. L. 108-7,

117 Stat. 11.  In Division K, the Act appropriates sums to the Department of Housing and Urban Development "for the fiscal year ending September 30, 2003."  *Id.*  Under Division K, Title II – Department of Housing and Urban Development, immediately preceding the passage under scrutiny, the Act makes available $13.0 billion dollars "on October 1, 2002" and $4.2 billion "on October 1, 2003."  *Id.*  The Act is simply littered with references to sums appropriated for various programs for "fiscal year" 2003, which consistently refers to the federal fiscal year.

HUD's argument that "fiscal year" as used in the 2003 Act may be interpreted as calendar year because various PHAs have distinct fiscal years is unavailing.  Regardless of the history and current Section 8 funding cycle (which the Parties seem to dispute), the Reduction Provision explicitly provides for its application "notwithstanding any other provision of law or regulation."  Thus, "fiscal year" as used in any particular ACC contract, per HUD regulations, or otherwise may not be used to interpret "fiscal year" as stated in the federal fiscal year appropriations act at issue.

Consequently, HUD's erroneous interpretation of "fiscal year," which is clearly intended to indicate the federal fiscal year rather than HUD's superimposed "calendar" year, affects HUD's implementation of the Reduction Provision both in terms of what constitutes "fiscal year 2003" payments (which shall also be addressed below), application of the Reduction Provision, and the calculation of "fees paid to such agency from funds made available in fiscal year 2002," which plainly refers to federal fiscal year 2002 rather than calendar year 2002.

       2.    <u>HUD's erroneous application of the Reduction Provision to FFY 2002 Appropriations Act Funds</u>

Defendants argue that the Reduction Provision can be applied to any funds, regardless of their appropriations source, provided to PHAs during calendar year 2003 after February 20, 2003. Pursuant to the 2005 Notice, HUD reasons that "[u]nlike the second and fifth provisos in the administrative fee paragraph in the 2003 Act, there is no language that explicitly ties the reduction provision to the money made available by the 2003 Act." 2005 Notice at 3. The language that HUD considers to tie the second and fifth provisos solely to funds made available by the 2003 Act is, respectively, "funds made available in this paragraph," and "funds provided in this paragraph." HUD argues that the third proviso,

> Provided further, That, notwithstanding any other provision of law or regulation, the amount of fiscal year 2003 fee payments otherwise authorized pursuant to the first proviso in this paragraph for a public housing agency shall be reduced accordingly by any such amounts remaining in such agency's administrative fee reserve account as of January 31, 2003 which exceed 105 percent of the amount of fees paid to such agency from funds made available in fiscal year 2002,

(emphasis added) does not contain language explicitly tying the reduction to "funds provided in this paragraph," such that the Reduction provision may be applied "to fiscal year 2003 fee payments," which allegedly may be interpreted as any fee payments made during fiscal year 2003 (which HUD further erroneously interpreted as calendar year), regardless of their funding source.

However, the Court finds that the Reduction provision is unambiguous in its application only to funds provided by the 2003 Act (which were actually distributed to the PHAs in payments between May of 2003 and December of 2003). The plain language of "fiscal year 2003 fee payments" explicitly refers to fee payments made from fiscal year 2003 funds. Defendant's reliance on the absence of the phrase "funds

provided in this paragraph ” in proviso [3] is of little moment in light of the general application of appropriations act restrictions only to the funds appropriated therein. *See Norcross v. United States*, 142 Ct. Cl. 763 (1958) (“It is manifest that the ban only applied to the funds made available for that year, and is what is known as a restriction on the use of funds made available ‘during the current fiscal year.’  It follows that the restriction does not apply to funds appropriated by a subsequent Congress, unless the restriction were again attached, nor would it apply to any fund that later might be made available for the payment of this obligation. . . . This is not a technical interpretation.  It is universally recognized.”).  *See also* 31 U.S.C. § 1301(a) (“Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.”).

The entire provision of $17,223,566,000 for funds related to the Section 8 program is limited by the proviso preceding Paragraph 5 and all other sections of the 2003 Act, which states “ [t]hat amounts made available under this heading are provided as follows[.]” Pub. L. No. 108-7, 117 Stat. 11.  As such, the Act is clear in stating the funds provided for in the 2003 Act are to be defined by the provisions of said Act.  The Act does not, however, state that all amounts made available under the 2003 *and prior* appropriations acts shall be limited by the provisions in the 2003 Appropriations Act, as HUD seems to suggest.  Furthermore, the FY 2002 Appropriations Act did not impose any such limitations on the payment of administrative fees to PHAs.  *See* Pub. L. No. 107-73, 115 Stat. 651, 659 (2001).  *See also Int’l Union, United Auto., Aerospace & Agric. Implement Workers of America v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (“[W]hen Congress does not intend to permit agency flexibility, but intends to impose a

legally binding restriction on an agency's use of funds, it does so by means of explicit statutory language."). The Court thus concludes that the 2003 Act is unambiguous in applying the Reduction Provision *only* to 2003 Appropriations Act funds such that HUD's interpretation as set forth in its 2005 Notice, which retroactively applies the Reduction Provision to funds appropriated by a prior appropriations act, is contrary to law.

Plaintiffs alternatively contend that "fiscal year 2003 fee payments otherwise authorized pursuant to the first proviso in this paragraph" are payments to be made from funds appropriated by the 2003 Appropriations Act actually made during federal fiscal year 2003, i.e., payments to be made from May 1, 2003, the date fee payments began using funds appropriated by the 2003 Act, to September 30, 2003, the literal end of federal fiscal year 2003. Pls.' Mem. for Summ. J. at 36-38. However, this amounts to little more than Plaintiffs wanting to have their cake and eat it too, as Plaintiffs essentially argue that the Reduction Provision should apply only to 2003 Act funds actually distributed during FFY 2003. As explained above, appropriations acts are generally intended to apply to funds distributed pursuant to such acts absent explicit language to the contrary. Since funds from the 2003 Act were distributed to the PHAs between May and December of 2003, such funds may be reduced pursuant to the Reduction Provision.

3.    Remand to HUD

In light of HUD's implementation of the 2003 Act in violation of Congress's unambiguous intent, the Court shall set aside HUD's interpretation resulting in an unauthorized implementation. "The judiciary is the final authority on issues of statutory

construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9, 104 S. Ct. 2778.  The term "fiscal year" unambiguously refers to the federal fiscal year, not the calendar year. Moreover, Congress clearly did not intend the mandate contained in the 2003 Act to apply retroactively to appropriations payments from prior fiscal years.  Accordingly, the Court shall remand to HUD to implement Paragraph 5 of the FFY 2003 Appropriations Act in compliance with the statute itself and the instant Opinion.  *See Assoc. of Amer. Railroads v. Costle*, 562 F.2d 1310 (D.C. Cir. 1977) ("[h]aving concluded that the Administrator of the EPA misinterpreted the clear statutory mandate to regulate 'the equipment and facilities' of interstate rail carriers, we direct that the Administrator reopen the consideration of Railroad Noise Emission Standards and promulgate standards in accordance with the statutory mandate as interpreted herein."); *Amer. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 821 n.5 (D.C. Cir. 2006) ("We do not doubt that, as in *Costle*, we may set aside an agency's 'misinterpret[ation] [of a] clear statutory mandate to regulate' and may "direct that the [agency] . . . promulgate standards in accordance with the statutory mandate.'").

The Court notes, however, that Congress enacted the Reduction and Recapture Provisions to "better align fees with actual costs" due to "concern[] that many PHAs have accumulated significant excess balances in reserve accounts from unspent section 8 administrative fees."  H.R. Rep. no 108-10, at 1370-71 (2003).  While it is clear to the Court that these "accumulated significant excess balances in reserve accounts" were not

sufficiently reduced to the 105 percent threshold via the FFY 2003 Appropriations Act payments made between May and December of 2003, it is unclear to the Court at first blush why HUD could not issue a revised accounting of the FFY 2003 payments made to the PHAs (if insufficient funds were calculated and thus reduced for such payments) and request a return of overpayment from the PHAs accordingly.  Of course, the Court cannot speculate on the propriety of this course of implementation, as doing so would place the Court beyond the purview of the present action.

      C.     *Due Process Claim*

In Count III of their Second Amended Complaint, Plaintiffs claim that "Defendants' implementation of the Reduction and Recapture Provisions, each and both, constitutes a violation of the Due Process Clause of the Fifth Amendment of the U.S. Constitution."  2d Am. Compl. ¶ 187.  Plaintiffs argue that HUD's implementation violates the Due Process Clause because it "is arbitrary and capricious and deprives the PHAs of the unrestricted use and enjoyment of the funds in their Reserves."  *Id.* ¶ 184.

In its Memorandum Opinion on Defendants' Motion to Dismiss, this Court dismissed a portion of Plaintiffs' Due Process claim, but did not dismiss it in full because the Court had "no explanation from HUD justifying [its] recent decision to apply the reductions to the months of January through April, in contrast to its earlier indications that the reductions would only apply beginning in May 2003.  As a consequence, the Court cannot make any determination as to whether HUD's recent decision in fact satisfies rationality review."  Mem. Op. at 62-63.  Accordingly, the only portion of Plaintiff's Due Process claim that remains applies to the application of the Reduction Provision between January 2003 and April 2003.  Furthermore, the 2005 Notice indicated

that HUD's final implementation of the Reduction Provision would apply from February

20, 2003, to December 31, 2003.  Consequently, Plaintiffs' remaining Due Process

challenge in actuality applies to Defendants' application of the Reduction Provision from

February 20, 2003, to April 30, 2003.[14]  Both Plaintiffs and Defendants brief this

particular claim in their respective motions for summary judgment and related filings

thereto.

Upon reviewing the relevant filings, the Court shall dismiss Plaintiffs' Due

Process claim for two reasons.  First of all, Plaintiffs appear to concede their Due Process

claim in their own filings.  In Plaintiffs' Motion for Summary Judgment, Plaintiffs' brief

argument with respect to their Due Process claim states that the "long" period between

HUD's initial and final interpretation of the Reduction Provision as applying to the

February 20, 2003-April 30, 2003 period at issue is reason itself to declare the final

implementation arbitrary, irrational, and unfair.  Pls.' Mem. for Summ. J. at 39-40.

Defendants, in their Opposition thereto, reject Plaintiffs' claim in part for Plaintiffs'

failure to demonstrate a property interest under the Due Process Clause, in part because

Defendants interpret Plaintiffs' claim as one of equitable estoppel (for which Plaintiffs do

not demonstrate any of the appropriate elements), and in part because Plaintiffs allegedly

have not met any other requirements for establishing a due process claim.  Defs.' Opp'n

---

[14]  The Court rejects, however, Defendants' argument that any retroactivity issue (and
thus Plaintiffs' Due Process claim) was eliminated when HUD's final implementation
changed the effective date for application of the Reduction provision from January 1,
2003, to February 20, 2003.  *See* Defs.' Mem. for Summ. J. at 21-22; Defs.' Opp'n to
Pls.' Mot. for Summ. J. at 28-29.  The Court's prior Memorandum Opinion makes clear
that Plaintiffs were free to proceed with their Due Process claim for the time period
between January 1, 2003, and April 30, 2003, as the principle of "retroactivity" applied
not to the effective date of the 2003 Appropriations Act, but to the "retroactive"
application of the Reduction provision to funds from prior appropriations acts, as the first
distribution of FFY 2003 Appropriations Act funds occurred in May of 2003.

to Pls.' Mot. for Summ. J. at 29. Notably, in their Reply, Plaintiffs do not respond in any

way to any of Defendants' arguments; in fact, Plaintiffs make no mention of their Due

Process claim in their "Argument" (which includes headings and lengthy discussion of

their Takings and APA claims). Thus, it appears to the Court that Plaintiffs have

conceded their Due Process claim, and the Court shall dismiss it on this basis.

Second, even if Plaintiffs' had not apparently conceded their Due Process claim

in its entirety via their lack of rebuttal in their Reply, they have failed to demonstrate the

existence of a property interest as defined by the Due Process Clause, which is a required

component of a Due Process claim. The Court noted in its Memorandum Opinion with

respect to Defendants' Motion to Dismiss that "[w]ithout a property right, neither

[Plaintiffs'] due process claim nor the takings claim can survive. *PAOSSE*, 477 U.S. at

54-55; *Peterson*, 799 F.2d at 807." *See* Mem. Op. at 40. The Court has already

determined that Plaintiffs have not demonstrated a property right pursuant to the Takings

Clause; however, the Court previously noted that the Takings Clause and the Due Process

Clause may provide different criteria in defining the existence of a property right. Mem.

Op. at 42. In this case, Plaintiffs fail to undertake any analysis to demonstrate a property

right pursuant to the Due Process Clause in any of their filings. Plaintiffs do not so much

as use the phrase "property right" with respect to their Due Process claim, even after

Defendants in their Opposition to Plaintiffs' Motion for Summary Judgment indicate that

Plaintiffs never demonstrate that a property interest exists, which is requisite to bringing

a successful Due Process claim. Defs.' Opp. to Pls.' Mot. for Summ. J. at 29 (citing

*Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487, 1491, 84 L.

Ed. 2d 494 (1985)). As such, in failing to demonstrate the existence of a property interest

pursuant to the Due Process Clause, which both the Court and Defendants noted was vital

to sustaining such a claim, Plaintiffs effectively conceded the lack of said interest such

that the Court shall alternatively dismiss Plaintiffs' Due Process claim on this basis.

Finally, while the Court shall dismiss Plaintiffs' Due Process claim as conceded

for the two aforementioned reasons, the Court notes that Plaintiff's Due Process claim

would otherwise effectively be moot at this juncture, considering the Court's holding that

HUD can only apply the Reduction Provision to FFY 2003 Appropriations Act funds.  As

such funds were not distributed until May 2003, HUD cannot on remand apply the

Reduction Provision to February 20, 2003-April 30, 2003 period at issue in Plaintiffs'

remaining Due Process claim.

### IV: CONCLUSION

For the reasons set forth above, Defendants' [37] Motion for Summary Judgment

is GRANTED with respect to Plaintiffs' Takings and Due Process claims, and DENIED

with respect to Plaintiffs' APA claim.  Conversely, Plaintiffs' [36] Motion for Summary

Judgment is GRANTED with respect to Plaintiffs' APA claim and DENIED with respect

to Plaintiffs' Takings and Due Process claims.  Accordingly, Plaintiffs' Takings and Due

Process claims are DISMISSED.  Plaintiffs' APA claim is GRANTED, as HUD's

implementation of the 2003 Act is deemed to violate the APA under the first prong of

*Chevron*; as such, the Court remands to HUD for implementation of the 2003 Act in

accord with the Act itself, the APA, and this Opinion.  An appropriate Order

accompanies this Memorandum Opinion.

Date:   January 16, 2007

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge